WILLIAM L. STERN (CA SBN 96105)
WStern@mofo.com
WILLIAM F. TARANTINO (CA SBN 215343)
WTarantino@mofo.com
LISA A. WONGCHENKO (CA SBN 281782)
LWongchenko@mofo.com
LAUREN WROBLEWSKI (CA SBN 291019)
LWroblewski@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

JULIE Y. PARK (CA SBN 259929)
JuliePark@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, CA 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendant
LUMBER LIQUIDATORS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LILA WASHINGTON; LAURA WASHINGTON; RYAN and KRISTIN BRANDT, husband and wife; KENNETH and CASANDRA BARRETT, husband and wife, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>LUMBER LIQUIDATORS, INC., a Delaware corporation,<br><br>        Defendant. | Case No. CV15-01475-JST<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:  May 14, 2015<br>Time:           2:00 p.m.<br>Dept:           1, 17th Floor<br>Judge:          Hon. Jon S. Tigar<br><br>Complaint filed:  April 3, 2015 |

1

## **TABLE OF CONTENTS**

2
**Page**

3 TABLE OF AUTHORITIES ....................................................................................................... ii

4 MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

I. INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

5 II. FACTUAL BACKGROUND ....................................................................................... 2

6     A. The "*60 Minutes*" Program. ............................................................................. 2

7     B. These Cases Started With a "Prop 65" Case Brought by a Short Seller. ............. 2

    C. A Cascade of Litigation and the "MDL" Proceeding. ........................................ 3

8     D. The *Washington* Lawsuit and Motion for Preliminary Injunction. ...................... 3

9     E. The Competing Motion by the *Silverthorn* Plaintiff. ........................................ 4

10     F. Background of This Product and the Regulatory Regime. ................................. 4

        1. What is Laminate Flooring?................................................................ 4

11         2. What is CARB Compliance? ............................................................... 5

12     G. The CPSC's Involvement and Its Rejection of Deconstructive Testing. ............. 7

13     H. Lumber Liquidators' Indoor Air Quality Testing Program. .............................. 8

        1. The Indoor Air Test Kit.................................................................... 8

14         2. There Are No Strings Attached.......................................................... 9

15         3. How the Indoor Air Testing Program Works...................................... 9

        4. CPSC Staff Has Reviewed the Program and Communications. ............ 11

16         5. Plaintiffs' Criticisms Are Unfounded. .............................................. 12

17     I. The Named Plaintiffs and Their Experience........................................................ 13

18         1. The Brandts. .................................................................................. 13

19         2. The Washingtons............................................................................. 14

        3. The Barretts. .................................................................................. 14

20 III. LEGAL STANDARD ................................................................................................... 14

21 IV. ARGUMENT ............................................................................................................... 15

22     A. Plaintiffs Have Not Shown Irreparable Harm. .................................................... 15

    B. Plaintiffs Have Not Shown the Heightened Standard for Mandatory

23         Injunctions............................................................................................... 19

24     C. Plaintiffs Have Not Shown Likely Success on the Merits. ............................... 20

    D. Plaintiffs Have Not Shown That the Balance of Hardships Favors Them......... 22

25     E. The Injunction Is Not in the Public Interest....................................................... 23

26     F. The Court Should Require a Bond if It Issues an Injunction. ........................... 24

V. CONCLUSION ............................................................................................................. 24

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Barth v. Firestone Tire & Rubber Co.*,
    661 F. Supp. 193 (N.D. Cal. 1987) ..................................................................................... 17

5

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs.*,
    181 F. Supp. 2d 1111 (E.D. Cal. 2001) ........................................................................ 17, 19

6

7

*Churchill Vill., L.L.C. v. Gen. Elec. Co.*,
    169 F. Supp. 2d 1119 (N.D. Cal. 2000), *aff'd*, 361 F.3d 566 (9th Cir. 2004) ....................... 14

8

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    No. 08-CV-3966(CBA), 2009 U.S. Dist. LEXIS 76306 (E.D.N.Y. Aug. 25, 2009) ............. 17

9

10

*Donovan v. Philip Morris USA, Inc.*,
    268 F.R.D. 1 (D. Mass. 2010) ............................................................................................. 17

11

*Friends of the Wild Swan v. Weber*,
    767 F.3d 936 (9th Cir. 2014) ............................................................................................... 18

12

13

*Garcia v. Google, Inc.*,
    743 F.3d 1258, *amended & superseded by* 766 F.3d 929 (9th Cir. 2014) ............................. 17

14

*Harris v. Bd. of Supervisors*,
    366 F.3d 754 (9th Cir. 2004) ......................................................................................... 17, 19

15

16

*In re R. M. J.*,
    455 U.S. 191 (1982) ........................................................................................................... 23

17

18

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ............................................................................................... 19

19

*Native Songbird Care & Conservation v. Lahood*,
    No. 13-cv-02265-JST, 2013 U.S. Dist. LEXIS 93120 (N.D. Cal. July 2, 2013)
    (Tigar, J.) ................................................................................................... 17, 18, 19, 20

20

21

22

*Norsworthy v. Beard*,
    No. 14-cv-00695-JST, 2015 U.S. Dist. LEXIS 47791 (N.D. Cal. Apr. 2, 2015)
    (Tigar, J.) ............................................................................................................................ 15

23

24

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
    104 Cal. App. 4th 508 (2002) ............................................................................................... 7

25

26

*People v. Super. Ct.*,
    46 Cal. 3d 381 (1988) .......................................................................................................... 7

27

28

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ......................................................................... 15, 16

*Pritchett v. Grenwald*,
  No. 2:13-CV-00896-BR, 2013 U.S. Dist. LEXIS 149978 (D. Or. Oct. 15, 2013) ................ 20

*S.F. Herring Ass'n v. United States DOI*,
  No. 13-cv-01750-JST, 2014 U.S. Dist. LEXIS 5984 (N.D. Cal. Jan. 15, 2014)
  (Tigar, J.) ............................................................................. 14, 15, 22, 23

*United States v. Schiff*,
  379 F.3d 621 (9th Cir. 2004) ......................................................................... 22, 23

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013) ......................................................................... 23

**STATUTES & RULES**

17 C.C.R.
  § 93120 ............................................................................................. 5
  § 93120.2(a) ......................................................................................... 5
  § 93120.3(b) ......................................................................................... 6
  § 93120.3(h) ......................................................................................... 6
  § 93120.4(a) ......................................................................................... 6
  § 93120.8(a) ......................................................................................... 5
  § 93120.8(b) ......................................................................................... 6
  § 93120.9 ........................................................................................... 6
  § 93120.9(a)(3)(A) ................................................................................... 7
  § 93120.9(c) ......................................................................................... 7

17 C.C.R. § 93120.9, Preliminary Draft of Amended ATCM, *available at*
  http://www.arb.ca.gov/toxics/compwood/amended0318.pdf ................................................. 6

Fed. R. Civ. P.
  65(c) ............................................................................................... 24

**OTHER AUTHORITIES**

California Air Resources Board, *Facts About Flooring Made with Composite Wood
  Products* (Mar. 3, 2015), *available at*
  http://www.arb.ca.gov/html/fact_sheets/composite_wood_flooring_faq.pdf ......................... 16

California Air Resources Board. Report to California Legislature: *Environmental Health
  Conditions in California's Portable Classrooms* (Nov. 2014), *available at*
  http://www.arb.ca.gov/research/apr/reports/l3006.pdf ........................................... 12

California Air Resources Board, Standard Operating Procedure for Finished Good Test Specimen Preparation Prior to Analysis of Formaldehyde Emissions from Composite Wood Products (Sept. 13, 2013), http://www.arb.ca.gov/enf/compwood_sop_fg_decon_091313.pdf. ........................................ 7

California Air Resources Board, Standard Operating Procedure, *available at* http://www.arb.ca.gov/toxics/compwood/outreach/formaldehydesop.pdf. ............................ 7

California Air Resources Board, *Summary of ARB Testing of Laminated Products* (Aug. 19, 2013), *available at* http://www.arb.ca.gov/toxics/compwood/laminated.pdf.................. 22

Consumer Product Safety Commission, *About CPSC*, *available at* http://www.cpsc.gov/en/About-CPSC/ (last visited Mar. 28, 2015)........................................ 7

Press Release, Global Cmty. Monitor, *Tests show flooring from Lumber Liquidators contains hazardous levsl of formaldehyde* (July 23, 2014), *available at* http://www.gcmonitor.org/llprop65pr/................................................................................. 2

Press Statement, *CPSC Chairman Elliot F. Kaye's Statement on Lumber Liquidators* (Mar. 25, 2015), *available at* http://www.cpsc.gov/en/Newsroom/Press-Statements/CPSC-Chairman-Elliot-F-Kayes-statement-on-Lumber-Liquidators/. .................. 8

Transcript: CPSC Chairman Elliot Kaye's Media Call on Lumber Liquidators, *available at* http://www.cpsc.gov/Global/Newsroom/CPSCPressCall03262015_FINAL.pdf ............... 8

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.     INTRODUCTION AND SUMMARY OF ARGUMENT**

3

There are now 100 similar cases filed around the country that are subject to a potential

4

MDL ruling on May 28, 2015,[1] seventeen of them in this Court.  The Plaintiffs in this case, and

5

the plaintiff in the related *Silverthorn* case,[2] have each brought motions attacking Lumber

6

Liquidators, Inc.'s ("Lumber Liquidators") free indoor air testing program.  Both say these

7

motions cannot await the JPML ruling because harm could result in the meantime.  They each

8

find different faults, and they seek contradictory relief.  The *Washington* plaintiffs want to end the

9

program through a preliminary injunction.  The *Silverthorn* plaintiff wants the Court to rewrite it.

10

This Memorandum addresses *Washington*, but both motions are misinformed:

11

- The indoor air testing program is an initial screening tool, from which determinations as to the need for follow-up and possible intervention can be made for those homes that have elevated levels of formaldehyde

12

13

- It is not a test of CARB compliance

14

- Plaintiffs' concerns about "false negatives" are misplaced

15

- Almost 25,000 customers have requested test kits

16

- The Consumer Product Safety Commission staff has been fully advised and reviewed the communications, and it requires Lumber Liquidators to report the results

17

18

- There are no strings attached.  The program is voluntary and there is no *quid pro quo*—no release, no waiver, no interview, no under-oath statements, and no effect on participation if a class were to be certified later.

19

20

Plaintiffs' concerns are tabloid-sounding, and imaginary.  They have not shown

21

irreparable harm, likelihood of success, balance of hardship in their favor, or that an injunction

22

would be in the public interest.  By contrast, Lumber Liquidators has a First Amendment right to

23

communicate truthfully with its customers.

24

For all the foregoing reasons, this Court should deny Plaintiffs' motion.

25

26

[1] *In Re: Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg. & Sales Practices Prods. Liab. Litig.*, MDL No. 2627.  The hearing is scheduled for May 28, 2015.

27

[2] *Silverthorn v. Lumber Liquidators, Inc.*, No. 15-cv-01428-JST.

28

## II.     FACTUAL BACKGROUND

### A.     The "*60 Minutes*" Program.

As Plaintiffs put it, "[o]n March 1, 2015, *60 Minutes* reported that Chinese-manufactured composite wood flooring products Defendant Lumber Liquidators Inc. sold showed dangerous levels of formaldehyde.  The news story immediately caused Lumber Liquidators' stock price to plunge…."  (Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, 1:3-5, Dkt. No. 11 ("Mot.").)

### B.     These Cases Started With a "Prop 65" Case Brought by a Short Seller.

There are currently 17 related cases before this Court.  The first was *Balero v. Lumber Liquidators, Inc.*, No. 3:15-cv-01005-JST.  Six months before *Balero* was filed, class counsel in *Balero* sued Lumber Liquidators in a "Proposition 65" case called *Global Community Monitor & Sunshine Park LLC v. Lumber Liquidators, Inc.*, No. RG14733979 (Alameda Super. Ct., filed July 23, 2014).  The second named plaintiff in that suit—Sunshine Park—is a newly-formed shell corporation affiliated with private investment companies that took substantial short positions in the stock of Lumber Liquidators.[3]

Another short seller, Whitney Tilson, manages three hedge funds through his company Kase Capital Management.  Mr. Tilson boasted three days after the *60 Minutes* program aired that it was (i) "my decision to bring the story to [*60 Minutes*]"; (ii) "[t]he three funds I manage are currently short 44,676 shares of LL (a $2.3 million position based on Friday's closing price), making it a 2.6% position (it was well over 3% before the stock got whacked last week)"; and (iii) "I first shorted it on 10/9/13 at $102.69. My last trade was shorting more on 10/6/14 at $56.06."  (Declaration of William L. Stern in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order and Expedited Discovery and the Washington Motion for Preliminary Injunction ("Stern Decl.") ¶ 12, Ex. C.)  Mr. Tilson also said that "I promised

---

[3] "Sunshine Park [is] a firm affiliated with private investment companies that have substantial short financial exposure to Lumber Liquidators."  *See* Press Release, Global Cmty. Monitor, *Tests show flooring from Lumber Liquidators contains hazardous levsl of formaldehyde* (July 23, 2014), *available at* http://www.gcmonitor.org/llprop65pr/.

*60 Minutes*, once I brought the story to them, that I wouldn't trade the stock until after the story aired (or they told me they decided not to do it)." (*Id.*)

### C.   A Cascade of Litigation and the "MDL" Proceeding.

Within days of the *60 Minutes* program, scores of nearly-identical class action lawsuits were filed around the county.  On March 9, 2015, plaintiffs in the related *Conte* action filed a motion with the Judicial Panel on Multidistrict Litigation.  (*See* Mot. for Consolidation & Transfer, *In Re: Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2627 (Dkt. No. 1).)  Today, there are over 90 actions subject to the JPML's forthcoming ruling.  No party has opposed transfer and consolidation.

### D.   The *Washington* Lawsuit and Motion for Preliminary Injunction.

This action was filed April 3, 2015, one of the last to be filed.  Like the other complaints before it, the grievance is that the subject products do not meet the California Air Resource Board's (CARB) formaldehyde emission standards.  Plaintiffs seek certification of California, Washington, and Florida classes of buyers of all of Lumber Liquidators' Chinese-made laminate wood flooring products.  (Compl. ¶ 98.)

On April 8, 2015, Plaintiffs filed their motion for preliminary injunction.  (Dkt. No. 11.) Their argument goes like this:

Lumber Liquidators has launched a "free do-it-yourself air testing kit" for concerned customers, but these tests "do not comply with accepted industry standards, are inherently unreliable, and are likely to under-report the amount of formaldehyde present."  (Mot. at 1:11-13.)  This is nothing but a "public relations campaign," (*id*. at 1:16), that will "falsely lead some people to believe that their floors are safe, and to forego effective measures to reduce the health risks the floors pose,"  (*id*. at 1:18-21).  Because "the results of this campaign will potentially be catastrophic," (*id*. at 1:17-18), this Court should enter a preliminary injunction "prohibiting Lumber Liquidators from representing that home air testing kits are an effective method of detecting the level of formaldehyde in their homes and to require Lumber Liquidators to advise inquiring customers to retain a qualified professional trained in environmental science, industrial

hygiene, or toxicology to perform proper testing and design an appropriate remediation plan," (Not. of Mot. at 1:8-11).

### E.      The Competing Motion by the *Silverthorn* Plaintiff.

These Plaintiffs are not the only ones to challenge Lumber Liquidators' indoor air quality testing.  The plaintiff in a related case called *Silverthorn v. Lumber Liquidators, Inc.*, No. 15-cv-01428-JST, has filed his own motion.  The similarity ends there.

The *Silverthorn* plaintiff advances a contradictory theory and seeks not to *end* the indoor air quality program, but to make it more to his liking:  (i) a protective order requiring Lumber Liquidators to notify consumers of the *Silverthorn* litigation, (ii) a protective order requiring Lumber Liquidators to provide *his counsel's* contact information, and (iii) an order for expedited discovery.  (Mot. for Protective Order and Expedited Discovery at 18:20-19:20, *Silverthorn* Dkt. No. 19.)

### F.      Background of This Product and the Regulatory Regime.

Plaintiff contends that the only "[c]ompetent testing" of CARB compliance is through a process called "deconstructive testing."  (Mot. at 1:25-2:1, 3:13-4:15.)  What is "deconstructive testing"?  Imagine taking a new car fresh off the assembly line, disabling its catalytic system, and measuring the tail pipe emissions.  If it flunked EPA emissions standards, no one would contend that the car's emission system was non-compliant.  You wouldn't alter a product, measure its performance, then file a lawsuit pretending that the results are comparable to emission readings taken from an un-tampered product.  Yet, that is exactly what these Plaintiffs contend.

Before debunking Plaintiffs' false notions of testing, we need to first explain the product and the regulatory regime.

### 1.      What is Laminate Flooring?

This case involves laminated flooring products, which are made with a medium density fiberboard (MDF) core.  (Compl. ¶¶ 1-2.)  MDF is like particleboard, except it uses wood fiber instead of wood chips, which is combined with wax and a resin binder and formed into panels under high temperature and pressure.  MDF is stronger and denser than plywood or particleboard.  Pictured below is an MDF "core" (left) and a particleboard "core" (right):



The MDF core provides the foundation, on top of which a decorative laminate is applied. This consists of papers decorated with an image of hardwood, usually applied with a reactive resin such as melamine-formaldehyde and a clear transparent wear layer or topcoat, which are affixed to the MDF substrate by heat and pressure.  This shows MDF with a laminate applied:



### 2.    What is CARB Compliance?

Formaldehyde emissions from composite wood products (including MDF) are governed by a regulation promulgated by CARB called the Airborne Toxic Control Measure, or ATCM. 17 C.C.R. § 93120.  The ATCM regulates emissions only from the "core," however, not the finished product.  *See* 17 C.C.R. § 93120.2(a).  That means if a core is ATCM-compliant, that core may be used to make finished goods by affixing laminate or wood veneer on top.  By the same token, CARB compliance means testing the core and not the finished product.

Retailers and importers such as Lumber Liquidators may sell products that contain MDF cores that are compliant with the ATCM's emission standards.  17 C.C.R. § 93120.8(a).  Lumber Liquidators must take "reasonable prudent precautions" to ensure the MDF cores in the finished

products they sell comply with CARB emission standards.  This includes instructing suppliers that the platforms must comply, obtaining written documentation from suppliers that the products comply, and keeping records to document the history of sales and precautions taken.  17 C.C.R. § 93120.8(b).

For manufacturers—Lumber Liquidators' Chinese suppliers of MDF—they must verify their compliance with the ATCM using third-party certified labs.  These certifiers must be approved by CARB's Executive Officer.  17 C.C.R. § 93120.4(a).  The third-party certifiers must also conduct quality assurance testing of the manufacturers' products (the cores) to verify that the emissions standards are met. 17 C.C.R. § 93120.3(b), (h).

In sum, CARB compliance is defined by the ATCM, which in turn regulates formaldehyde emissions *from the core only*.  Manufacturers must ensure their products comply with the regulation *by testing the core* and then labeling the products as compliant.[4]  Importers, such as Lumber Liquidators, must purchase product from certified manufacturers.

Plaintiffs disagree.  Their allegations of non-compliance are based on "deconstructive" testing, which involves ripping off the laminate layer from a *finished* product down to the "glue line" in an attempt to simulate what the formaldehyde emissions might have been if the same unadulterated core had been tested.  They are mistaken.

Plaintiffs cannot deny that:

- Deconstructive testing is *not* mentioned in the ATCM.

- Deconstructive testing is not mentioned in the March 14, 2014 draft amendments to the ATCM.[5]

_____

[4] Plaintiffs misstate Lumber Liquidators' position.  They claim that "Lumber Liquidators believes formaldehyde testing must be done on the finished product only, and without removing the laminate coating."  (Mot. at 4:18-19.)  This is incorrect.  Perhaps Plaintiffs are confused because their motion is confused; they conflate two entirely separate things, CARB compliance and indoor air quality.  CARB compliance has nothing to do with finished product testing; it regulates the core only.  Indoor air quality testing has nothing to do with CARB compliance; it measures formaldehyde levels in the air regardless of the source.

[5] *See* 17 C.C.R. § 93120.9, Preliminary Draft of Amended ATCM (e.g., amending provisions regarding methods to establish equivalence among testing procedures), *available at* http://www.arb.ca.gov/toxics/compwood/amended0318.pdf.

1
2

- "Deconstructive testing" is not mentioned in Section 93120.9(c), the section of the ATCM that lists the "specific enforcement test methods" that "shall be" used for finished product testing.

3
4

- "Deconstructive testing" is not mentioned in the August 2013 CARB Standard Operating Procedure that describes how to measure emissions from composite wood products.[6]

5

A law cannot "require" something—here, the deconstruction of a product for "finished

6

product" testing—that isn't there.  Like an un-posted speed limit, that would violate due process.

7

*See People v. Super. Ct.*, 46 Cal. 3d 381, 389 (1988); *People ex rel. Bill Lockyer v. Fremont Life*

8

*Ins. Co.*, 104 Cal. App. 4th 508, 514-15 (2002).

9

Where, then, are Plaintiffs getting the idea that deconstructive testing is the only

10

"competent" test method to prove CARB compliance?  They rely on a document that CARB

11

issued on September 13, 2013 called "Standard Operating Procedure for Finished Good Test

12

Specimen Preparation Prior to Analysis of Formaldehyde Emissions from Composite Wood

13

Products."[7]  (Mot. at 4:11-16.)  That document mentions deconstructive testing, but it was never

14

approved by CARB.[8]  Moreover, it simply instructs the lab technician how to *prepare* a sample to

15

be tested, but not how to interpret the results.

16

### G.    The CPSC's Involvement and Its Rejection of Deconstructive Testing.

17

The Consumer Product Safety Commission (CPSC) is the federal agency "charged with

18

protecting the public from unreasonable risks [from] … consumer products."[9]  On March 25,

19

2015, the Chairman of the CPSC announced in a press conference that "[w]e are actively

20

investigating laminate flooring products from Lumber Liquidators" and that "[t]he company has

21

22
23

[6] "Sampling and Analysis of Formaldehyde Emissions from Composite Wood Products" (Nov. 2012) was approved by the Board.  California Air Resources Board, Standard Operating Procedure, *available at* http://www.arb.ca.gov/toxics/compwood/outreach/formaldehydesop.pdf.

24

[7] http://www.arb.ca.gov/enf/compwood_sop_fg_decon_091313.pdf.

25
26

[8] In order to be an approved test method under the ATCM, there must be (1) findings that demonstrate equivalence to existing test methods, and (2) the method must be approved by the Executive Officer of the Board.  17 C.C.R. § 93120.9(a)(3)(A).  Both conditions had to arise with respect to this document; neither did.

27
28

[9] *See* Consumer Product Safety Commission, *About CPSC*, *available at* http://www.cpsc.gov/en/About-CPSC/ (last visited Mar. 28, 2015).

been cooperative."[10]   A news reporter asked if the CPSC plans to use deconstructive testing.

Chairman Kaye said no:

> Q:  There has been a lot of debate about the type of testing that's been used.  I don't know  - there's a deconstructive test is the best one or not.  I mean, as you know, Lumber Liquidators says that's not right.  You should be looking at use in the home.  What kind of test would you be using?  Will you be using the deconstructive testing?
>
> A:  *We are not*.  *So we're looking at testing in a method that most closely replicates the way that the products are used in the home*.[11]

### H.     Lumber Liquidators' Indoor Air Quality Testing Program.

These are the facts concerning Lumber Liquidators' indoor air testing program.

### 1.     The Indoor Air Test Kit.

Following the *60 Minutes* program, Lumber Liquidators saw a significant increase in calls to its "800" number.  (Declaration of Brian Pullin in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order and Expedited Discovery and the Washington Motion for Preliminary Injunction ("Pullin Decl.") ¶ 2.)  In response, Lumber Liquidators initiated an air quality testing program.  The goal is to apprise concerned homeowners of the air quality readings in their homes using a recognized sampling tool administered by the customer and analyzed by an independent third-party lab.  (*Id.* ¶ 7.)  The program provides indoor air quality screening tests to consumers who purchased laminate flooring sourced from China.  (*Id.* ¶ 3.)  To receive a home test kit, customers either call the "800" number or fill out an online form.  (*Id.* ¶ 5.)  As of April 21, 2015, 24,915 test kits have been sent to Lumber Liquidators' customers.  (*Id.* ¶ 6.)

---

[10] Press Statement, *CPSC Chairman Elliot F. Kaye's Statement on Lumber Liquidators*, (Mar. 25, 2015), *available at* http://www.cpsc.gov/en/Newsroom/Press-Statements/CPSC-Chairman-Elliot-F-Kayes-statement-on-Lumber-Liquidators/.

[11] Transcript: CPSC Chairman Elliot Kaye's Media Call on Lumber Liquidators, *available at* http://www.cpsc.gov/Global/Newsroom/CPSCPressCall03262015_FINAL.pdf (emphasis added).

### 2.    There Are No Strings Attached.

This is a voluntary program.  (Pullin Decl. ¶ 7.)  No one is asked to give up anything.  The program is free to customers who purchased Lumber Liquidators' laminate flooring sourced from China.  If anyone does not approve of the methodology, or simply does not want to participate, he or she can ignore the offer.  (*Id*.)

Customers are not asked or required to settle, release, or waive any claims in exchange for receiving or completing a home test kit.  (*Id.*)  They are not required to sign any statements under oath, or submit to an interview by defense counsel or anyone else.  (*Id.*)  And whether or not they avail themselves of the testing has no effect on whether they may still participate in a class action.

### 3.    How the Indoor Air Testing Program Works.

If the customer bought a qualifying product, his request gets routed to Customer Care.  Customer Care will send that information to Building Health Check LLC ("Building Health"), which sends the test kit to the customer.  (Declaration of Rajiv Sahay, Ph.D. in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order and Expedited Discovery and the Washington Motion for Preliminary Injunction ("Sahay Decl.") ¶ 14.)

The test kit is made by Building Health.  (*Id.*)  It consists of a passive air sampling badge, a chain of custody form, sampling instructions, and frequently asked questions.  (*Id.* ¶ 17.)  Building Health obtains these badges from three manufacturers—Advanced Chemical Sensors, Inc. (ACS), Assay Technology, Inc. (AT), and Sensors Safety Products (SSP).  (*Id.*)  Each badge contains a sampling medium consisting of silica gel coated with 2,4-dinitrophenylhydrazine (2,4-DNPH).  (*Id.*)  All three types of badges are consistent in all material respects to the requirements of passive air quality monitoring badges used by employers to determine compliance with requirements set by the Occupational Health and Safety Administration (OSHA) and the National Institute for Occupational Safety and Health (NIOSH).  (*Id.*)

Customers are provided one or more test kits depending on the square footage of their flooring (one kit for every 600 ft.²).  (Pullin Decl. ¶ 5.)  Instructions are provided along with the test kits.  (Sahay Decl. ¶¶ 15, 19.)  The instructions direct the customer to hang the badge four feet off the floor and sample for 24 hours for the best readings.  (*Id.* ¶ 19)  EDLab maintains a

1    toll-free number that consumers can call for support.  (*Id.*)  The customers are instructed to

2    sample their indoor air and then send the test kit back to the lab.  (*Id.*)

3         The test kits are a reliable means of screening for elevated formaldehyde levels, as

4    demonstrated by several criteria.  They are based on established methods for sampling

5    formaldehyde in indoor air.  (*Id.* ¶ 18.)  Each type of badge has been validated by one of EDLab's

6    accredited partner laboratories or other qualified third party.  (*Id.*)  In addition to established

7    methods and analysis by accredited labs, the tests have other indicia of reliability.  The test has a

8    low detection limit of approximately .003 ppb.  (Declaration of John F. McCarthy in Support of

9    Defendants' Oppositions to the Silverthorn Motion for Protective Order and Expedited Discovery

10   and the Washington Motion for Preliminary Injunction ("McCarthy Decl.") ¶ 7.)  The tests have

11   good accuracy.  (*Id.*)  The test kits have no known significant interferences from other chemicals.

12   (*Id.*)

13        Unlike CARB testing, which measures emissions from a sample piece of flooring that is

14   placed in a small vacuum chamber, the passive sampling badges provided to Lumber Liquidators'

15   customers measure actual formaldehyde concentrations in the indoor air of the customer's home.

16   The labs that analyze the results are accredited by AIHA-LAP, LLC, a leading accreditation for

17   industrial hygiene labs for formaldehyde analysis.  (Sahay Decl. ¶¶ 8-13, 18.)  Once a test kit is

18   received by the lab, the customer is expected to be informed of the results directly by the lab after

19   a short period of time.  (*Id.* ¶ 15.)

20        After the analysis is complete, customers will receive test results via email (or U.S. Mail if

21   no email address is provided) from the lab.  (Pullin Decl. ¶ 8.)  Lumber Liquidators will also

22   receive customers' test results from the lab.  (*Id.*)

23        Lumber Liquidators receives the test results for two reasons.  First, it is required to share

24   the test results with the CPSC and with other government authorities.  (Declaration of William F.

25   Tarantino in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order

26   and Expedited Discovery and the Washington Motion for Preliminary Injunction ("Tarantino

27   Decl.") ¶ 6.)  Second, the data helps Lumber Liquidators ensure good customer service, including

28

allowing Lumber Liquidators to help the customer determine whether additional steps need to be taken with respect to each individual's flooring or indoor air quality.  (Pullin Decl. ¶¶ 8, 9.)

Customer Care will send out different follow-up letters depending on the test results.  (*Id*. ¶ 10.)  One letter is sent to customers whose results show formaldehyde levels under 0.040 parts per million.  (*Id*. Ex. A.)  A second is sent to customers whose results are between 0.040 and 0.080 parts per million.  (*Id*. Ex. B.)  And a third is sent to customers whose results are above 0.080 parts per million.  (*Id*. Ex. C.)  These different letters ensure that customers with elevated formaldehyde levels receive the appropriate degree of personal attention from customer care.  (*Id*. ¶ 10.)

For customers who receive test results with elevated levels (above 0.080 parts per million), they will receive a letter and an affirmative phone call from a customer service representative who will administer a test validation form (i.e., a survey).  (*Id*. ¶ 11.)  The validation form was designed by a certified industrial hygienist; its purpose is to assess whether there were any material errors with how the customer used the sampling badge and to identify the specific source of elevated formaldehyde levels in the customer's home.  (Tarantino Decl. ¶ 7.)  Customers in the median range will also receive a survey if they call with additional questions or want more detailed information than what is provided in the customer service FAQs.  (Pullin Decl. ¶ 11.)

Customer care will continue to work with customers who have completed the test validation form, which begins the process of ensuring that the customer is satisfied with his or her air quality and that his or her floors are safe.  (*Id*. ¶ 12.)  That could entail any number of individual measures, depending on individual circumstances.  (*Id*.)

### 4.     CPSC Staff Has Reviewed the Program and Communications.

As part of Lumber Liquidators' efforts to cooperate fully with the CPSC, Lumber Liquidators has shared details regarding its home formaldehyde testing with CPSC staff.  (Tarantino Decl. ¶ 4.)  The company has sought and received feedback on the customer communications plaintiffs seek to enjoin.  (*Id*. ¶ 5.)  For example, Lumber Liquidators sent to the CPSC its proposed communications to customers, (*id*.), which are attached to Mr. Pullin's

1   Declaration as Exhibits A-C.  It also sent copies of proposed communications from EDLab

2   enclosing the customer's formaldehyde test results.  (*Id*.)  The CPSC staff's comments were

3   incorporated into the final letters.  (*Id*.)  As the CPSC official stated in making those comments

4   on the communications, "[s]taff comments are focused on improving the value of information

5   being provided to consumers."  (*Id*.)

6   **5.      Plaintiffs' Criticisms Are Unfounded.**

7   The accompanying expert report by Dr. John McCarthy puts to rest any claim that Lumber

8   Liquidators' indoor air testing is unreliable or unscientific.  Dr. McCarthy holds a Ph.D from

9   Harvard University and has more than 30 years' experience in environmental exposure

10  assessment.  Dr. McCarthy was the principal investigator hired by the CPSC in conducting

11  research studies related to sulfur gas emissions from Chinese drywall.  (McCarthy Decl. ¶ 2.)

12  Dr. McCarthy opines that "Lumber Liquidators utilized passive dosimeters, which is an

13  established, well-validated procedure, as the preferred screening technique to assess

14  formaldehyde levels in the subject homes," and that "[t]his approach, of providing passive

15  dosimeters which are sent from a central laboratory to untrained lay people for deployment and

16  collection using written instructions for guidance, has been utilized in multiple peer reviewed

17  studies, with success, for decades to successfully evaluate indoor environments"  (*Id*. ¶ 6.)

18  Indeed, CARB itself used a similar passive dosimeter approach in a survey performed in 2001 for

19  measuring formaldehyde in portable classrooms.  (*Id*.)[12]

20  Plaintiffs misunderstand the goal of this program.  It is to serve as a broad-based screening

21  tool to identify homes with elevated formaldehyde levels and to determine whether additional

22  follow-up or remedial measures are warranted.  (*Id*. ¶ 11.)  It is not being used to attempt to test

23  CARB compliance.

24

25

26  ─────────────

27  [12] California Air Resources Board. Report to California Legislature: *Environmental Health Conditions in California's Portable Classrooms* (Nov. 2014), *available at* http://www.arb.ca.gov/research/apr/reports/l3006.pdf.

28

1    Most importantly, Dr. McCarthy confirms that Plaintiffs' specter of false negatives—the

2    notion that homes deeply saturated with high levels of formaldehyde will go undetected because

3    of this program, (Mot. at 9:10-11)—is completely misplaced.  (McCarthy Decl. ¶ 17.)

4        Dr. McCarthy also takes to task the criticisms of Plaintiffs' expert, Elisabeth Black.  He

5    exposes her shortcomings as so profound and abundant that the mere telling would more than

6    consume the page limits allotted for this Memorandum.  Instead, we refer the Court to

7    Dr. McCarthy's Declaration at paragraphs 10-20.

8    **I.      The Named Plaintiffs and Their Experience.**

9        **1.      The Brandts.**

10       In August 2014, Ryan and Kristin Brandt purchased approximately 370 square feet of

11   laminate flooring in Fort Myers, Florida.  (Compl. ¶ 83.)  They installed some of the flooring in

12   one room in their home.  (*Id.* ¶ 91.)  On March 5, 2015, the Brandts paid Charles Yelvington to

13   test the flooring for formaldehyde.  (Kristin Brandt Declaration ("Brandt Decl.") ¶ 7 (Dkt.

14   No. 13).)  Mr. Yelvington did a very odd thing; he did not test the indoor air, nor did he perform

15   deconstructive testing.  Rather, he placed a meter inside the box of uninstalled laminate planks—

16   contrary to what Plaintiffs' expert Ms. Black recommends—and reported formaldehyde readings

17   of 1.63 ppm.  (*Id.*; Declaration of Lauren Wroblewski in Support of Defendants' Opposition to

18   Motion for Preliminary Injunction ("Wroblewski Decl.") ¶¶ 2-5.)[13]  The very same day, Mr.

19   Yelvington tested the flooring of another putative class member, also living in Fort Myers, and

20   generated *the identical report* as the Brandts' report, including even the same typographical

21   misspellings.  (*Compare* Pullin Decl., Exs. D *with* Ex. E.)  For both homeowners, he

22   recommended that the flooring "needs to come out immeadiatley [sic] for the Health [sic] sake of

23   the entire family."

24

25

26       [13] His purported readings of the formaldehyde from the Brandts' *uninstalled* laminate
     planks still in the plastic wrap could not have measured the "risk related to the presence of
     formaldehyde containing flooring in the home," much less contemplated "the[] considerations
27   [listed by Ms. Black]" pertaining to indoor air quality.  (*Cf.* Black Decl. ¶¶ 14, 15.)  Thus, "it is
     [Ms. Black's] opinion that the testing cannot be considered valid."  (*Id.*)
28

1    Ms. Brandt requested a test kit from Lumber Liquidators and was sent one by the lab.

2    (Brandt Decl. ¶ 8; Sahay Decl. ¶ 16.)

3            **2.    The Washingtons.**

4    Plaintiffs Lila and Laura Washington live in San Jose, and in October 2014 installed

5    300 square feet of product in their home.  (Compl. ¶¶ 17, 59, 67.)  The lab sent Ms. Washington a

6    test kit.  (Sahay Decl. ¶ 16.)

7            **3.    The Barretts.**

8    In March 2013, plaintiffs Kenneth and Casandra Barrett, who live in Grand Rapids,

9    Michigan, purchased approximately 1,500 square feet of laminate.  (Compl. ¶¶ 70, 78.)  The

10   Barretts allege that they "contacted" Lumber Liquidators (*id.* ¶ 81), but Lumber Liquidators has

11   no record of a call to the "800" number from the phone number the Barretts provided, nor a

12   record of written correspondence from the Barretts.  (Pullin Decl. ¶ 16.)  The lab sent the Barretts

13   a test kit.  (Sahay Decl. ¶ 16.)

14   **III.    LEGAL STANDARD**

15   "A preliminary injunction is an extraordinary and drastic remedy, one that should not be

16   granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Churchill Vill.,*

17   *L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1125-26 (N.D. Cal. 2000) (citing *Mazurek v.*

18   *Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis added), *aff'd*, 361 F.3d 566 (9th Cir. 2004).  "A

19   plaintiff seeking a preliminary injunction 'must establish that he is likely to succeed on the merits,

20   that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

21   equities tips in his favor, and that an injunction is in the public interest.'"  *S.F. Herring Ass'n v.*

22   *United States DOI*, No. 13-cv-01750-JST, 2014 U.S. Dist. LEXIS 5984, at *9 (N.D. Cal. Jan. 15,

23   2014) (Tigar, J.) (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052

24   (9th Cir. 2009)).  "To grant preliminary injunctive relief, a court must find that "a certain

25   threshold showing is made on each factor."  *Id.*, at *9-10 (citing *Leiva-Perez v. Holder*, 640 F.3d

26   962, 966 (9th Cir. 2011)).  "Provided that this has occurred, in balancing the four factors, 'serious

27   questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can

28   support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a

likelihood of irreparable injury and that the injunction is in the public interest." *Id.*, at *10 (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

Because a mandatory injunction, which requires a party to take action rather than simply preserve the status quo, "goes well beyond simply maintaining the status quo pendente lite [it] is particularly disfavored." *Norsworthy v. Beard*, No. 14-cv-00695-JST, 2015 U.S. Dist. LEXIS 47791, at *45 (N.D. Cal. Apr. 2, 2015) (Tigar, J.) (citation and internal quotations omitted). "[M]andatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases…'" *Id.* (citing *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1980)).

## IV.  ARGUMENT

### A.  Plaintiffs Have Not Shown Irreparable Harm.

Plaintiffs claim that there will "likely" be irreparable harm if the Court does not enter an injunction because the presence of high levels of formaldehyde in flooring can cause serious injury, and "people must take prompt action to remove the source or to reduce the potential exposure." (Mot. at 8:16-19.)  They make the tabloid-like claim that "[t]housands of Lumber Liquidators customers are terrified that their floors contain dangerous levels of formaldehyde that can cause cancer and other ailments" (*id*. at 1:13-14) and, because these ailments are irreparable harm, they have met their burden (*id.* at 8:15-9:20).  They are wrong.

First, Plaintiffs misunderstand Lumber Liquidators' testing program.  It is not "do-it-yourself testing kits." (Mot. at 1:23.)  It is a screening tool, which is just the first of a multi-step process that involves various levels of action depending on the initial home testing result.

Second, there has to be a "sufficient causal connection" between the irreparable harm and the challenged conduct. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011).  But Plaintiffs have not shown that continuing the indoor air testing is likely to *cause* irreparable harm.

Lumber Liquidators' testing program does not *cause* formaldehyde exposure, much less *cause* harmful health effects.  Rather, it is designed to assist consumers to *identify* formaldehyde levels in their homes.  Plaintiffs would have the Court say, "No, you must stop trying to help these consumers identify this potential hazard."  Plaintiffs' convoluted argument is that (i) the

testing kits are "likely to show false-negative results," (Mot. at 9:11); (ii) these results would lure consumers into a false sense of safety, when they would have otherwise commissioned their own tests which would necessarily be more reliable than Lumber Liquidators' and would lead consumers to remove their flooring or take some other necessary action;[14] (iii) consumers will thus unknowingly be exposed to elevated levels of formaldehyde; (iv) the cause of the elevated formaldehyde levels is necessarily their flooring (as opposed to any one of other countless household items that emit formaldehyde such as furniture, cabinets, carpeting, paint, or household cleaners); and (v) they will then develop serious health effects related to formaldehyde exposure. This is nonsensical.

*Perfect 10* is instructive.  Perfect 10 argued that Google provided free access to its proprietary images, thereby destroying its business model and threatening financial ruin.  As evidence, plaintiff included declarations describing how the number of images available on Google had increased significantly, company revenue declined during the same period, and financial losses were pushing the company to bankruptcy.  The Ninth Circuit found that "Perfect 10 has not established that the requested injunction would forestall [bankruptcy]."  653 F.3d at 981.  The plaintiff failed to show it was ever in sound financial shape, failed to account for the fact that other search engines also provided free images, and failed to submit a statement of a single former subscriber who stopped paying Perfect 10 because of the freely available images on Google.  *Id.* at 981-82.

These failings and more are present in this case.  Plaintiffs have no evidence that Lumber Liquidators' air testing program *causes* health problems.  They have no evidence that the program has caused a single consumer to get sick, or even to be lured into a false sense of a security,

---

[14] Never mind the fact that CARB advises against removing the flooring.  *See* California Air Resources Board, *Facts About Flooring Made with Composite Wood Products* (Mar. 3, 2015), *available at* http://www.arb.ca.gov/html/fact_sheets/composite_wood_flooring_faq.pdf ("As a general rule, we do not recommend removing a flooring product unless there are noticeable health effects (i.e. nose and throat irritation, a burning sensation of the eyes, wheezing, and difficulty in breathing), and other measures [...] taken to alleviate them have failed and there is good reason to believe the flooring is the source of the problem."

1   which *theoretically* could make a consumer sick.  Instead, the alleged cause (indoor air testing)

2   and the effect (health effects of formaldehyde) are several degrees of separation removed.

3   None of Plaintiffs' cited authorities support them.  All of their cases involve direct harm

4   *caused* by the challenged conduct, for example, plaintiffs' unauthorized appearance in a film

5   caused her to receive death threats (*Garcia v. Google, Inc.*, 743 F.3d 1258, *amended &*

6   *superseded by* 766 F.3d 929 (9th Cir. 2014)); defendant's failure to respond to emergency

7   dispatch instructions for power generators would cause harm (*Cal. Indep. Sys. Operator Corp. v.*

8   *Reliant Energy Servs.*, 181 F. Supp. 2d 1111, 1129-30 (E.D. Cal. 2001)); hospital closures would

9   cause harm (*Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004)); reduced price

10  cigarettes cause a harmful increase in smoking (*City of New York v. Golden Feather Smoke Shop,*

11  *Inc.*, No. 08-CV-3966 (CBA), 2009 U.S. Dist. LEXIS 76306, at *119 (E.D.N.Y. Aug. 25, 2009)).

12  The *Harris* court specifically distinguished cases like this, where there is a "chain of causation

13  involving third parties and speculation distancing plaintiffs' likely injury."  366 F.3d at 763.

14  Plaintiffs' real argument is not that the air testing program causes harm; rather, it is just

15  not "good enough" for their liking, and they want to become court-appointed architects of a

16  different program with more "effective measures"—such as tearing out all laminate flooring.

17  (Mot. at 8:16-19.)  They cite cases—notably, none involving preliminary injunctions—in which

18  plaintiffs seek to establish medical monitoring funds.[15]  This is odd; the better analogy for them

19  would be cases in which the *defendant* has established such a fund and the plaintiff seeks a

20  preliminary injunction saying "No, not good enough!"  No wonder they have no such cases.

21  Second, and relatedly, Plaintiffs have not demonstrated that irreparable harm is *likely*.

22  "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote

23  future injury."  *Native Songbird Care & Conservation v. Lahood*, No. 13-cv-02265-JST, 2013

24  U.S. Dist. LEXIS 93120, at *31 (N.D. Cal. July 2, 2013) (Tigar, J.) (citing *Winter v. Natural Res.*

25

26      [15] *See, e.g., Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 26 (D. Mass. 2010) (class
    certification order allowing a 23(b)(2) class for medical monitoring of smoker class members);
27  *Barth v. Firestone Tire & Rubber Co.*, 661 F. Supp. 193, 205 (N.D. Cal. 1987) (denying motion
    to dismiss and allowing cause of action for a medical monitoring fund to proceed).
28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. CV15-01475-JST
sf-3526040

17

1   *Def. Council*, 555 U.S. 7, 22 (2008)).  Plaintiffs must demonstrate "imminent injury in the

2   absence of injunctive relief."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir.

3   2014) (citing *Caribbean Marine Servs. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)).  This

4   means Plaintiffs must show that it is "likely, not just possible" that consumers will develop

5   dangerous health conditions if Lumber Liquidators continues to offer indoor air testing.[16]  *See id.*

6   (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

7       In *Native Songbird*, this Court found that any harm of swallow deaths was not likely

8   because, while deaths occurred in the past, there was no evidence suggesting the deaths were

9   continuing.  It was not enough that the plaintiffs' expert said that faulty netting continued to pose

10   "grave risks" to the swallows.  There was no showing of a significant likelihood of future harm.

11   2013 U.S. Dist. LEXIS 93120, at *33.  Here, Plaintiffs have shown even less.  They do not allege

12   to have suffered *any* health effects, and cannot point to anyone else who has.[17]

13       The most they allege is that the tests are "likely to show false-negative results," but they

14   have no credible evidence to back this up.  (Mot. at 9:11.)  The likelihood that someone whose

15   home emits high levels of formaldehyde will escape detection by taking advantage of Defendants'

16   outreach program is extremely low.  (McCarthy Decl. ¶¶ 4, 15.)  Moreover, Lumber Liquidators

17   has disclosed this program to CPSC staff, who understands the protocol and testing methodology

18   and the identity of the independent third-party lab that is overseeing the testing.

19       <u>Third</u>, the alleged harm is tied up with the merits.  Plaintiffs tell the Court that "harm" is

20   obvious because health effects surely constitute irreparable harm.  But the harm they allege is

21   inseparable from the looming merits questions.  What level of formaldehyde is harmful?  What

---

22   [16] Plaintiffs may argue that they are not seeking to terminate Lumber Liquidators' indoor
23   air testing program, but merely to "prevent Lumber Liquidators from representing that its do-it-
yourself testing kits accurately measure formaldehyde levels." (Mot. at 1:22-23.)  In other words,
24   Lumber Liquidators can offer the testing, so long as it doesn't say the testing is in any way
accurate or reliable.  Plaintiffs' distinction makes no sense.  Their request is to stop the program
25   from operating in any meaningful way.  In fact they admit that their goal is to "forc[e] [Lumber
Liquidators] to *abandon* a callous public relations campaign." (Mot. at 12:21-22.) (Emphasis
26   added.)

27   [17] Plaintiffs must show that the *testing program* is the cause of likely irreparable harm, but
they have not even shown that the *flooring* is likely to cause dangerous health problems.  None of
28   the Plaintiffs allege to have gotten sick.

1    other household sources contribute to formaldehyde levels?  What kind of test should a consumer

2    rely on to measure formaldehyde levels in the home?  How does CARB-compliance relate to

3    indoor air quality?  Plaintiffs have no answers.

4    <u>Fourth</u>, Plaintiffs' authorities are unpersuasive for additional reasons.  In no case did the

5    plaintiffs seek to enjoin remedial action taken with a federal agency's knowledge.  The moving

6    parties were attempting to stop directly harmful acts, such as hospital closures and refusal to

7    provide emergency electricity services.  *See, e.g., Cal. Indep. Sys. Operator*, 181 F. Supp. 2d

8    1111; *Harris*, 366 F.3d 754.  Here, Lumber Liquidators is providing free "no strings attached"

9    assistance to consumers concerned about the levels of formaldehyde in their homes, regardless of

10   the source.

### B.   Plaintiffs Have Not Shown the Heightened Standard for Mandatory Injunctions.

13   "The Ninth Circuit, amongst other circuits, adopts a 'heightened standard with respect to

14   mandatory injunctions.'"  *Native Songbird*, 2013 U.S. Dist. LEXIS 93120, at *37 (citing *Park*

15   *Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1161 (9th Cir. 2011)

16   *cert. denied*, 132 S. Ct. 756 (2011)).  "To be granted a mandatory injunction, Plaintiffs must show

17   that 'extreme or very serious damage will result' to their claimed interests."  *Id.* (citing *Park Vill.*,

18   636 F.3d at 1160).  Plaintiffs fail to meet this standard.

19   Plaintiffs do not even mention the heightened standard, much less provide the requisite

20   evidence.  They may argue that the injunction they seek is prohibitive, rather than mandatory, but

21   they would be mistaken.  Plaintiffs are requesting that Lumber Liquidators change the status quo

22   by halting its current air testing program and providing different remedial action, thereby

23   disrupting ongoing investigations in thousands of consumers' homes.  Halting the air testing

24   program would require recalling the test kits sent to consumers and explaining to thousands of

25   consumers that Lumber Liquidators will not complete its investigation.  This is an affirmative

26   step that changes the status quo.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,

27   571 F.3d 873, 879 (9th Cir. 2009) (the affirmative step of recalling a product constituted a

28

19

1   mandatory injunction); *Native Songbird*, 2013 U.S. Dist. LEXIS 93120, at *40 (taking down

2   netting constituted a mandatory injunction).

3        The Court should not take the extreme action Plaintiffs request because the facts and law

4   do not "clearly favor the moving party." *Native Songbird*, 2013 U.S. Dist. LEXIS 93120, at *40-

5   41 (citing *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993)). In *Native Songbird*,

6   the Court found that "[t]he question of whether properly installed netting will harm the birds is

7   vigorously contested, and the evidence that such netting will trap and kill birds in significant

8   numbers is essentially speculative." 2013 U.S. Dist. LEXIS 93120, at *41. The same is true

9   here. Whether the testing program (or the flooring) will harm consumers is vigorously contested,

10  and Plaintiffs have *no* evidence that it does. There is no basis to conclude that "Plaintiffs have

11  demonstrated that they are likely to suffer the sort of 'extreme or very serious damage' that

12  permits the Court to order Defendants to begin taking affirmative conduct pending litigation on

13  the merits." *Id.*

14        **C.        Plaintiffs Have Not Shown Likely Success on the Merits.**

15        Plaintiffs fail to make any showing of likely success on the merits of their consumer

16  protection claims. Instead, they merely repeat the allegations in their complaint. (Mot. at 10:4-

17  12:2.) They need evidence; they have none. *See Pritchett v. Grenwald*, No. 2:13-CV-00896-BR,

18  2013 U.S. Dist. LEXIS 149978, at *8-9 (D. Or. Oct. 15, 2013) (denying preliminary injunction

19  because plaintiff merely stated that he lost weight and suffered medical problems, but did not

20  submit "concrete evidence" in support of his claim). Plaintiffs have given the Court no basis to

21  conclude that Lumber Liquidators misrepresented that its products comply with CARB

22  requirements.[18]

23        Plaintiffs contend that their consumer protection claims are likely to succeed because

24  "Lumber Liquidators misrepresented material facts about its products and omitted the truth about

25  their formaldehyde content. Leading consumers to believe that its products were CARB

26

27        [18] In the alternative, Plaintiffs argue that serious questions exist as to the merits. (Mot. at
28  10:2.) They haven't met this standard either.

compliant was deceptive." (Mot. at 11:1-5.) This is nothing more than a conclusory allegation. It restates what Plaintiffs' *theory* is, but says nothing about whether this theory is likely to succeed on the merits. In the "Facts" section of Plaintiffs' memorandum, Plaintiffs refer to "tests" reported by *60 Minutes* that purportedly found emission standards that exceeded CARB limits. This too is nothing but an unsupported allegation. (*Id.* at 3:21-4:4.) And, as we have shown, those tests, relying on deconstructing the sample before testing the MDF core, are unreliable and do not figure in CARB compliance.

Their expert Dr. Elisabeth Black also cites the tests and claims that after reviewing the reports she believes "the laboratories appear to have conducted their analysis of Lumber Liquidators composite wood laminate flooring in strict compliance with the ASTM method and with CARB requirements." (Declaration of Elisabeth Black ("Black Decl.") ¶ 25.) But Dr. Black is a Certified Industrial Hygienist with a B.A in Psychology and M.S in Environmental Health. Her resume and credentials do not reflect experience with composite wood products, formaldehyde, or the California Air Resources Board. She is not a chemist, nor does she have any professional laboratory experience. Her expertise and certifications are limited to industrial hazards. In sum, she lacks any specialized knowledge or expertise that would allow her to interpret the ATCM, the product testing protocols adopted by CARB, or these products' regulatory compliance.

In the end, Plaintiffs' only evidence is the *60 Minutes* tests and Ms. Black, who assures us that she has *read* the test reports and all of them recite that the labs report that they performed the tests in accordance with ASTM D6007. (Black Decl. ¶ 22.) But deconstructive testing has been widely criticized as failing to produce reliable results precisely because the deconstruction process itself disturbs the core and can release additional formaldehyde that was present in the glue and laminate coatings—which everyone agrees are part of the *finished* product and do not figure in CARB compliance. Indeed, CARB itself conducted a study that compared emissions

1  between finished products, raw platforms, and deconstructed products; it found variability in the

2  results.[19]

3      Plaintiffs have no answers to any of these issues.  Instead, they claim that the "Court will

4  only need to apply the testing results to the regulations to determine whether Lumber Liquidators

5  products exceed CARB limits."  (Mot. at 10:17-19.)  Ignoring the hurdles their claims face does

6  not establish likelihood of success on the merits.

7      **D.    Plaintiffs Have Not Shown That the Balance of Hardships Favors Them.**

8      Even if the Court were to find that the merits raise "serious questions," "'serious

9  questions' will only support the issuance of a preliminary injunction where the balance of

10  hardships 'tips sharply' in Plaintiff's favor."  *S.F. Herring*, 2014 U.S. Dist. LEXIS 5984, at *21

11  (citing *Alliance for the Wild Rockies*, 632 F.3d at 1135).  Plaintiffs have not demonstrated that the

12  balance of hardships tips in their favor, sharply or otherwise.

13      Plaintiffs argue that the question is one of balancing financial concerns with "preventable

14  human suffering."  (Mot. at 12:8-10.)  All of their cited authorities focus on balancing these two

15  interests.  (*Id.* at 12:8-18 (citing cases).)  But this is not a case where financial concerns are at

16  odds with health concerns.  Lumber Liquidators' testing program is free for consumers.  It is

17  being paid for entirely by the company.  This is not a money-making enterprise.  Lumber

18  Liquidators began the program solely to help consumers understand the formaldehyde levels

19  currently in their homes and offer assistance to reduce those levels if necessary.

20      If Lumber Liquidators is enjoined from continuing its air testing program, consumers will

21  face the hardship of no longer receiving free, reputable information, and Lumber Liquidators will

22  face the hardship of being barred from communicating with its customers and providing high

23  quality customer service.[20]  Lumber Liquidators' interests are perfectly aligned with its

24  

25      [19] *See* California Air Resources Board, *Summary of ARB Testing of Laminated Products*, (Aug. 19, 2013), *available at* http://www.arb.ca.gov/toxics/compwood/laminated.pdf.

26      [20] Commercial speech is protected by the First Amendment, and thus generally may not be enjoined, unless the party seeking the injunction demonstrates "that it is fraudulent," or "that [it] will incite imminent lawlessness," or if that the "speech . . . aids or abets criminal activity . . . ."

27  *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004).  The party seeking to silence the commercial speech "bears the burden of showing that [such restriction serves] a substantial

28  (Footnote continues on next page.)

1   customers.  It is the remedy these Plaintiffs seek that is out of alignment.  The program provides

2   them with information about their homes they would in all likelihood not otherwise receive.  If

3   Lumber Liquidators is forced to discontinue the program, customers will likely receive no

4   information about the air quality in their homes or might be inclined to pay for other testing,

5   which may or may not be reputable.

6           On the other hand, if the injunction is denied, the *Washington* Plaintiffs face no hardship.

7   The program is voluntary.  If they do not wish to participate—though they all asked for test kits—

8   they don't have to.  The program has no effect on anyone's future rights.  (Pullin Decl. ¶ 7.)  Nor

9   does the program impose a hardship on putative absent class members.  The program simply

10  provides information and resources.  Many consumers will find these helpful.  That these

11  Plaintiffs do not is no reason to kill the program for all.  The "hardship" Plaintiffs complain of is

12  speculative at best.  *See S.F. Herring*, 2014 U.S. Dist. LEXIS 5984, at *22 ("it is difficult for the

13  Court to conclude that permitting the federal government to enforce the Organic Act will

14  *necessarily* have the effect of extending the fishermen's time on the water") (emphasis added).

15          **E.      The Injunction Is Not in the Public Interest.**

16          Plaintiffs insist "the public interest will be served ***only*** if Lumber Liquidators is enjoined

17  from portraying its home testing kits as being a viable substitute to professional testing."  (Mot. at

18  13:7-8 (emphasis added).)  "The public interest is served," they say, "by encouraging [consumers]

19  to commission proper testing and to take the necessary remedial measures immediately."  (*Id.* at

20  13:10-11.)

21

22  _____

    (Footnote continued from previous page.)

23  [governmental] interest, that the restriction directly advances that interest and that the restriction
    is not more extensive than necessary to serve the interest."  *Valle Del Sol Inc. v. Whiting*,
24  709 F.3d 808, 816 (9th Cir. 2013).  In fact, even where the Court finds the speech misleading, it
    "may not place an absolute prohibition . . .  if the information also may be presented in a way that
25  is not deceptive."  *In re R. M. J.*, 455 U.S. 191, 203 (1982).  Thus, the less restrictive and
    "preferred remedy" for any misstatement "is more disclosure, rather than less."  *Id.* at 201
26  (internal quotation marks omitted).   Because Plaintiffs cannot show that Lumber Liquidators'
    communications are misleading, much less that they are actually false or fraudulent, they cannot
27  satisfy their heavy burden to show that their requested broad injunctive relief is necessary or
    appropriate.  *See Schiff*, 379 F.3d at 626.
28

Plaintiffs' argument shows precisely why they are not entitled to injunctive relief. They agree that testing is helpful to consumers, but simply wish to impose different testing standards more to their liking. Yet they have not explained the "proper testing" they prefer. Surely it cannot be the testing commissioned by Ms. Brandt from flooring inspector Mr. Yelvington. His testing method appears to be of his own invention. (Wroblewski Decl. ¶¶ 3-4, 10-11.)

**F.      The Court Should Require a Bond if It Issues an Injunction.**

If the Court were to enter a preliminary injunction, the costs of terminating the existing program of almost 25,000 test kits would be enormous. In that event, Lumber Liquidators would request permission to submit evidence of the costs as part of the bond-setting process pursuant to Federal Rule of Civil Procedure 65(c).

**V.      CONCLUSION**

For the foregoing reasons, Lumber Liquidators respectfully requests that this Court deny Plaintiffs' motion for a preliminary injunction.

Dated:  April 22, 2015

WILLIAM L. STERN
WILLIAM F. TARANTINO
JULIE Y. PARK
LISA A. WONGCHENKO
LAUREN WROBLEWSKI
MORRISON & FOERSTER LLP

By: /s/ *William L. Stern*
        William L. Stern

Attorneys for Defendant
LUMBER LIQUIDATORS, INC.